## NEW YORK OYER AND TERMINER.

### MARCH, 1851.

Before EDMONDS, Justice, and two aldermen.

### THE PEOPLE v. HENRY CARNEL.

The insanity which exempts from legal responsibility for crime must be the absolute dispossession of the free and natural agency of the mind, and an absence of the capacity to form an intention, and to devise the means of executing it.

The apprehension of an arrest on an accusation for crime is not the apprehension of great personal danger that would render a homicide justifiable.

It will be enough to constitute a homicide murder, if the design to effect death is formed at the instant, and is the impelling power of the fatal act

INDICTMENT for murder.

The prisoner was a Frenchman, and had been only a short time in this country. At the house where he boarded he became acquainted with a French family named Rosseau, consisting of a father and three sons. Rosseau bought a drinking saloon, and paid for it in the prisoner's presence, and thus the fact that the deceased had money, and where he kept it, to wit, in a particular trunk, became known to the prisoner. He was in the habit of visiting Rosseau's store almost every evening.

One evening he came late to the place, after the customers had all left, and after the family had gone to bed. He craved for admittance, and was permitted to come in, and on his solicitation was allowed to stay all night. The saloon consisted of two rooms, and had two beds in, in one of which Rosseau and one son slept, and the other two sons in the other. The prisoner slept on the floor, near the door between the two rooms. After they had all been asleep several hours, the two sons who slept together were awakened by repeated stabs given by the prisoner. The lad who slept on the back side

The People v. Henry Carnel.

of the bed was stabbed first, and received four wounds; the other received one or two, when their outcries caused the prisoner to cease, and he went into the other room. There he met the elder Rosseau, who seized him, and received from the prisoner a blow in the neck from which he bled to death in a few seconds.

The prisoner then attempted to make his escape by jumping out of the window of that room. Instead of escaping, however, he fell into an area, from which he tried in vain to get out, and where he was found after day-light, covered with blood.

He had laid himself down to sleep near the trunk in which he knew the money was kept.

Three defenses were set up for him on his trial — insanity, self-defense, and the absence of an intention to kill.

*The Judge* charged the jury, among other things, that the insanity which was to excuse crime must be not the mere impulse of passion, an idle, frantic humor, or unaccountable mode of action, but an absolute dispossession of the free and natural agency of the human mind. To warrant a conviction the jury must be satisfied that the prisoner had the capacity to form an intention, and devise the means of executing it.

To justify the homicide on the ground of self-defense there must have been at the time imminent danger of great personal injury, and they would therefore inquire whether there was cause for the prisoner to apprehend any danger but that of being arrested for the violence of which he had already been guilty?

And as to the absence of a design to effect death, the jury were instructed that it would be enough if they were satisfied that he had an intention to kill at the moment of striking the blow, even though such intention was formed on the instant.

To the last part of the charge the counsel for the prisoner excepted.

The prisoner was convicted of murder.